## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-02789

ZACHARY MANCHAS,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
JOSEPH STEWART, in his individual capacity,
MIA SANCHEZ, in her individual capacity,
JASON SIMMONS, in his individual capacity,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Zachary Manchas, by and through his attorneys, Andy McNulty and Mari Newman of NEWMAN | MCNULTY, respectfully alleges for his Complaint and Jury Demand as follows:

### <u>INTRODUCTION</u>

1.    Plaintiff Zachary Manchas, a veteran, was arrested, jailed, and criminally prosecuted simply because he protested and filmed the arrest of a person of color from a public sidewalk in downtown Denver, Colorado. This is far from the first time that Denver Police Department ("DPD") officers have retaliated against those who criticize and film them, and as it has in the past, Defendant City and County of Denver ("Denver") again failed to hold accountable the officers who blatantly violated the constitution. Mr. Manchas brings this lawsuit with the hope that Defendants might face some accountability for their actions, and Denver will cease to tolerate its officers' blatant flouting of civilians' constitutional rights.

1

## PARTIES

2.      At all times relevant to this Complaint, Plaintiff Zachary Manchas was a citizen of the United States of America and a resident of and domiciled in the State of Colorado

3.      At all times relevant to this Complaint, Defendant Denver was a Colorado municipal corporation.

4.      At all times relevant to this Complaint, Defendant Joseph Stewart was a citizen of the United States and resident of and domiciled in the State of Colorado. At all relevant times, Defendant Stewart was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for Denver. Defendant Stewart is a peace officer employed by a local government and, therefore, is subject to suit under C.R.S. § 13-21-131.

5.      At all times relevant to this Complaint, Defendant Mia Sanchez was a citizen of the United States and resident of and domiciled in the State of Colorado. At all relevant times, Defendant Sanchez was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer for Denver. Defendant Sanchez is a peace officer employed by a local government and, therefore, is subject to suit under C.R.S. § 13-21-131.

6.      At all times relevant to this Complaint, Defendant Jason Simmons was a citizen of the United States and resident of and domiciled in the State of Colorado. At all relevant times, Defendant Simmons was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for Denver. Defendant Simmons is a peace officer employed by a local government and, therefore, is subject to suit under C.R.S. § 13-21-131.

7.     Defendants Stewart, Sanchez, and Simmons are referred to collectively herein as the "Individual Defendants."

## JURISDICTION AND VENUE

8.     This action arises under the Constitution and laws of the United States, and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

9.     Venue is proper in this District according to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this District and all Defendants reside in this District.

10.     Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

## FACTUAL ALLEGATIONS

### Mr. Manchas is an upstanding citizen with a strong sense of civic duty.

11.     Mr. Manchas has always felt a sense of civic duty and the desire to help others. At the age of seventeen, Mr. Manchas joined the Air Force and was accepted into the Defense Language Institute to learn Arabic and work as an Airbourne Cryptologic Linguist. Due to various international political circumstances, the need for Arabic Linguists diminished and Mr. Manchas was asked to pioneer a new career field as an Airborne Intelligence, Surveillance, and Reconnaissance Operator. After training, Mr. Manchas was recruited into JSOC (Joint Special Operations Command) and tasked with pursuing the twenty-five most wanted terrorists.

12.     After serving in the Air Force, Mr. Manchas began work in international business. Mr. Manchas was promoted faster than any of his colleagues and rose the ranks from an entry-

level position to supporting over four hundred employees in sixty different countries in three years. Through this career, Mr. Manchas developed a keen interest in the financial sector. Mr. Manchas went on to attend the University of Colorado and received his master's degree in Commodity Finance.

**DPD officers arrest Mr. Manchas because he is recording them in the performance of their duties and asking for their identifying information.**

13.     In the early morning hours of June 12, 2022, Mr. Manchas left Herb's bar in the lower downtown neighborhood of Denver. While Mr. Manchas walked along Larimer Street, he saw a police officer pull over a vehicle.

14.     Mr. Manchas did not see the vehicle do anything illegal and noticed that the driver of the vehicle was a person of color. Mr. Manchas also watched as the DPD officers performing the stop, Defendants Joseph Stewart and Mia Sanchez, immediately pulled out their guns and pointed them at the driver of the vehicle while screaming directives. The aggressiveness of Defendants Stewart's and Sanchez's tactics startled Mr. Manchas. He immediately became concerned that the stop itself, and the inexplicably aggressive tactics by Defendants, were unlawfully race-based.

15.     Because of this, Mr. Manchas pulled out his phone and began filming the traffic stop from the sidewalk. While recording, Mr. Manchas was standing directly next to another individual on the sidewalk who was also watching the traffic stop.

16.     Mr. Manchas eventually asked Defendants Stewart and Sanchez if they were recording the stop on their body-worn cameras. In response, Defendant Stewart rudely yelled at Mr. Manchas to shut up.

17.     Defendants Stewart and Sanchez proceeded to handcuff the driver of the vehicle and place him in the back of their police cruiser. After the driver of the vehicle was safely in the

back of the police vehicle, Mr. Manchas asked Defendant Stewart for his name and badge number. Mr. Manchas wanted Defendant Stewart's name and badge number so that he could file a complaint against Defendant Stewart for telling him to "shut up" and acting unprofessionally.

18.     In response, Defendant Stewart, along with Defendant Sanchez, angrily ordered Mr. Manchas to back up. Mr. Manchas replied that he was simply standing on the sidewalk. It was clear that Mr. Manchas' decision to film Defendants Stewart and Sanchez and ask for their identifying information angered Defendants Stewart and Sanchez.

19.     Defendant Stewart then ordered Mr. Manchas to stand back by a vehicle that was parked behind his police cruiser, or Mr. Manchas would go to jail. Mr. Manchas responded that he would follow Defendant Stewart's order, and complied by moving back next to the car that Defendant Stewart asked him to stand nearby. While doing so, Mr. Manchas repeated his request that Defendant Stewart provide his name and badge number.

20.     Defendant Stewart again commanded Mr. Manchas to "shut up" and stand back by the car behind the police cruiser in a manner that demonstrated his anger with Mr. Manchas' continued filming of Defendants Stewart and Sanchez and Mr. Manchas' insistence that they provide their identifying information. Instead of providing Mr. Manchas with his identifying information, Defendant Stewart refused to provide his name and badge number and continued to repeat his directive that Mr. Manchas move back near the car behind the police cruiser, even though Mr. Manchas already complied with that order.

21.     Tellingly, Defendants Stewart and Sanchez issued no such directives to the other individual who was standing next to Mr. Manchas, but not filming or asking for their identifying information, and was standing closer to Defendants Stewart and Sanchez on the sidewalk than Mr. Manchas.

22.     Seconds after Mr. Manchas complied with Defendants Stewart's and Sanchez's orders, but still continued to film their activities and ask for Defendant Stewart's name and badge number, both Defendant Stewart and Defendant Sanchez arrested Mr. Manchas. The officers took Mr. Manchas' phone and stopped his recording.

23.     Defendants Stewart and Sanchez then conspired with Defendant Sergeant Jason Simmons to institute bogus charges against Mr. Manchas. Defendants Stewart, Sanchez, and Simmons ultimately decided to charge Mr. Manchas with interference. All three officers knew there was no basis for the charge but charged Mr. Manchas anyway to cover up Defendants Stewart's and Sanchez's unlawful arrest of Mr. Manchas and to retaliate against Mr. Manchas for daring to film Defendants Stewart and Sanchez and ask for their identifying information.

24.     Mr. Manchas spent the night in jail. This was the first and only time Mr. Manchas had ever been incarcerated. Mr. Manchas was prosecuted for months and had to endure the possibility that he would have a criminal record. Mr. Manchas also had to pay a lawyer to defend the charges against him.

25.     Mr. Manchas' charges were finally dismissed in January of 2022. Mr. Manchas' charges were dismissed as part of a deferred prosecution with no admission of guilt. The dismissal of the charges indicated that the charges were baseless, that there was no probable cause to believe Mr. Manchas committed any crime, and that Mr. Manchas was not guilty of any crime.

26.     As a result of his unlawful arrest and the necessity to retain legal counsel to obtain a dismissal, Mr. Manchas missed an opportunity to study abroad and advance his educational and career opportunity. Mr. Manchas was also forced to spend thousands of dollars for lawyers to defend the charges against him.

27.     As part of Mr. Manchas' criminal proceedings, numerous individuals came forward as character witnesses for him. Those who know Mr. Manchas describe him as loyal and righteous. Mr. Manchas is a caring person who regularly goes out of his way to help others.

**Pursuant to its custom and practice, Defendant Denver abjectly failed to discipline Defendants Stewart, Sanchez, and Simmons for their unconstitutional conduct.**

28.     Upon information and belief, Defendant Denver has imposed no discipline on the Individual Defendants for their unconstitutional actions against Mr. Manchas. Upon information and belief, Defendant Denver has not even conducted an investigation into its officers' clearly unconstitutional actions. Defendant Denver, through its inaction, has condoned the conduct of the Individual Defendants.

29.     Based on Denver's custom and practice of tolerating and ratifying such unconstitutional conduct, the Individual Defendants knew prior to violating Mr. Manchas' constitutional rights that they would not be disciplined by Defendant Denver for their actions.

30.     Through its failure to supervise and discipline Individual Defendants, Defendant Denver ratified their unconstitutional actions.

31.     This was not the first time that Defendant Denver condoned its officers' unconstitutional retaliation, through arrests and initiation of baseless prosecutions, against individuals who record officers in the performance of their duties.

32.     It was also not the first time that Defendant Denver condoned its officers' unconstitutional retaliation, through arrests and initiation of baseless prosecutions, against individuals who criticize police officers.

33.     Defendant Denver has a longstanding pattern of ratifying its officers' unconstitutional retaliation, through arrests and malicious prosecutions, against individuals who record officers in the performance of their duties and criticize police officers, as detailed below.

Because of this longstanding pattern, the Individual Defendants in this case knew that they could unconstitutionally retaliate against Mr. Manchas (through their arrest of him and baseless prosecution of him) and not face any discipline or other consequences from Defendant Denver. This custom and practice of ratifying unconstitutional retaliation was known by Defendants Stewart, Sanchez, and Simmons before they retaliated against Mr. Manchas, and caused them to retaliate against Mr. Manchas (through their arrest of him and baseless prosecution of him) without fear that they would be disciplined by Defendant Denver.

34.     Through its continuous ratification of unconstitutional retaliation (which its officers routinely impose through arrests, uses of excessive force, and initiation of baseless prosecutions) against individuals who record officers in the performance of their duties or criticize police officers, Defendant Denver has condoned and ratified the conduct of the Individual Defendants.

**Defendant Denver is liable for its officers' violations of Mr. Manchas' rights pursuant to its multiple unconstitutional customs and practices.**

35.     All of the acts described herein were done by the Individual Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Mr. Manchas' federally protected rights and were done pursuant to the preexisting and ongoing deliberately indifferent custom and practice of Defendant Denver.

36.     The Individual Defendants' treatment of Mr. Manchas was pursuant to Defendant Denver's customs and/or practices of unlawful conduct, including but not limited to:

a.   Retaliating against individuals for engaging in speech activity that is critical of DPD officers;

b.   Retaliating against individuals for recording police conduct;

c.   Initiating malicious prosecutions in an attempt to cover-up police misconduct; and

    d.   Failing to discipline officers, or even find officers have engaged in wrongdoing, in the face of obvious unconstitutional actions.

**<u>Defendant Denver failed to adequately supervise its officers.</u>**

37.    Upon information and belief, Defendant Denver has provided no additional training to the Individual Defendants related to the incident with Mr. Manchas.

38.    Defendant Denver failed to properly train and/or supervise its employees to avoid inhibiting free speech, the use of excessive force, unlawful seizure, unlawful search, and the initiation of malicious prosecutions.

39.    Defendant Denver could have and should have pursued reasonable methods for the training and supervising of such employees but failed to do so.

40.    The other incidents outlined below illustrate an obvious need, of which Defendant Denver was aware at the time of Mr. Manchas' arrest, for Defendant Denver to provide further supervision to its officers on the necessity of not retaliating against individuals who criticize and/or record police officers.

**<u>Defendant Denver has a custom and practice of retaliating against individuals who record and are critical of police officers.</u>**

41.    Defendant Denver has a history of retaliating against individuals who record and are critical of police officers—an issue that should have long since been addressed by Defendant Denver. The following cases show that at the time of Mr. Manchas' arrest, there was a formal or informal custom and practice, that was known to Defendant Denver, of retaliating against individuals who record and criticize police officers, and of condoning this retaliation.

42.    Defendant Denver has also ratified and condoned its officers' actions pursuant to this custom by failing to discipline its officers for arresting and individuals for criticizing and/or recording law enforcement.

43.    On August 14, 2014, Levi Frasier video-recorded Denver Police Department ("DPD") officers abusing an arrestee from a distance and at a public place. In response, the abusive DPD officers threatened him, took his video-recording device, and deleted the video from it. Luckily, Mr. Frasier was able to recover the video. He subsequently released it to the media. Instead of thanking Mr. Frasier for coming forward to share information about the misconduct of its officers, the DPD released a statement defending its officers' behavior and unfairly attacking Mr. Frasier's character. Then, DPD officers retaliated against Mr. Frasier by seeking him out and arresting him on a few outstanding warrants so as to maliciously prosecute him in retaliation for his speech. It was clear that the DPD officers were using this as a pretext to retaliate against Mr. Frasier for filming them. Denver ratified its officers' actions in public. And, it never disciplined its officers for their illegal actions.

44.    On January 26, 2015, DPD officer threatened a witness who was attempting to file the aftermath of the DPD shooting of Jessica Hernandez. That witness tried to video-record the officers' actions in public while she was standing on her own property. DPD officers ordered her not to record. The DPD officers who engaged in this blatantly unconstitutional conduct were not disciplined in any way.

45.    On the morning of May 23, 2018, DPD officers arrested Elijah Wesbrock for using a video camera and mobile phone to record police conduct. After unlawfully arresting him, the DPD officers pushed Mr. Wesbrock against their vehicle and proceeded to illegally search him. After searching Mr. Wesbrock, they forced him into the back of their vehicle. DPD officers arrested and searched Mr. Wesbrock in retaliation for him recording public places. Mr. Wesbrock filed a federal lawsuit and Denver paid Mr. Wesbrok $80,000 to settle his claims.

46.     On July 5, 2018, Susan Greene was driving east on Colfax Avenue on her way to the bank when she saw a Black man, handcuffed and seated naked on the sidewalk across from the State Capitol Building. Several DPD officers stood around the man, who had no clothes on except a towel that covered his private parts. Concerned as both a public citizen and professional journalist, Ms. Greene parked her vehicle and crossed the street – by way of the crosswalk – onto the sidewalk nearby the scene. Ms. Greene stood on the public sidewalk and was not obstructing the police investigation. As Ms. Greene stood on the public sidewalk near the intersection of Colfax Avenue and Grant Street, out of the way of the officers, she took pictures of the scene with her iPhone. She was quickly stopped by one of the DPD officers who blocked her, got in her face, and told her to stop. Ms. Greene responded that it was a public sidewalk and that she had the right to take photos. The DPD officer told her that she did not. Ms. Green again asserted her First Amendment right to stand on the public sidewalk and take photos, without being in the way of the officers. Shortly thereafter, the DPD officer decided to arrest her. He grabbed Ms. Greene and twisted her arm backwards beyond its normal range of motion, to an excessive degree, causing Ms. Greene instant pain in her arm and shoulder. Another DPD officer then handcuffed Ms. Greene, tightly enough to leave clearly imprinted and red marks on her skin, and pushed her toward a nearby police car by grabbing her arm roughly and with a painful upward thrust even though at no point did Ms. Greene resist being handcuffed. One of the officers then seized Ms. Greene's iPhone during her arrest. The officers proceeded to unlawfully search Ms. Greene. The officers put Ms. Greene – handcuffed – into a police car, where she sat for ten minutes before being released. During the encounter, one officer condescendingly told Ms. Greene that she should "act like a lady." No DPD officer was disciplined for their actions in arresting Ms. Greene for recording police activity and her criticism of the police. Ms. Greene

threatened to file a federal lawsuit and she settled her claims against Denver for $50,000 along with significant non-monetary consideration.

47.     On September 23, 2018, Brian Loma and Mikel Whitney were exercising their First Amendment rights on the Sixteenth Street Mall by criticizing the police. During Mr. Loma's protest, he shouted, "fuck the police!" Upon hearing these words, some of the DPD officers began to conspire with how to retaliate against him by arresting him for disturbing the peace, and eventually did arrest him. Mr. Whitney observed Mr. Loma's protest and subsequent arrest. As a concerned citizen and friend of Mr. Loma's, Mr. Whitney took photos of the incident, believing the officers were committing illegal acts in retaliation against Mr. Loma for his protected speech. The other officers on scene demanded Mr. Whitney not take pictures, and then arrested him. The officers proceeded to unlawfully search Mr. Whitney and Mr. Loma. The officers then instituted a baseless and malicious prosecution of both Mr. Whitney and Mr. Loma to cover-up their unconstitutional actions. Those charges were dropped by the prosecutor's office because they had no merit. None of the officers involved were disciplined for their unconstitutional actions. Mr. Whitney and Mr. Loma filed a federal lawsuit, and they settled their claims against Denver for $128,000.

48.     On September 23, 2018, Caryn Sodaro, an outspoken advocate for the homeless, was arrested by DPD Officers for alleged trespassing while handing out meals to the homeless and protesting on a public sidewalk on the Sixteenth Street Mall. Ms. Sodaro claimed she was never provided with a trespass notice advising her that she was not permitted to be on the property, and instead, officers arrested her in retaliation for engaging in First Amendment protected activity. Ms. Sodaro was cited for trespass and detained at the Denver Detention Center. Ms. Sodaro's arrest was unconstitutional and in retaliation for her engaging in First

Amendment protected activity. The officers who unconstitutionally arrested Ms. Sodaro then instituted baseless charges against her to cover-up their unconstitutional retaliation and to punish her for speaking out. Denver never disciplined the officers for their unconstitutional actions.

49.     On September 24, 2018, Eric Brandt was standing on the Sixteenth Street Mall criticizing police officers and recording a livestream video of that protest. Multiple DPD officers arrested Mr. Brandt in retaliation for his protected speech and recording, and cited him with disturbing the peace. The officers proceeded to unlawfully search Mr. Brandt. The officers initiated a baseless prosecution to cover-up their actions. After spending two days in jail, Mr. Brandt was released and his charge was dropped the next day, on September 27, 2018, because there was no merit to the charges. None of the officers involved were disciplined for their unconstitutional actions. Mr. Brandt filed a federal lawsuit and Mr. Brandt settled his claims against Denver for $65,000.

50.     On July 15, 2019, multiple DPD officers violated the First Amendment rights of Natalie Kantor by retaliating against her for criticizing and recording them in the public performance of their duties. Ms. Kantor was in a car that was pulled over by DPD officers on suspicion that the driver was driving under the influence. DPD officers performed a field sobriety test of the driver then, without warning, attempted to arrest the driver. The officers took him to the ground. When they did, Ms. Kantor exited the car to see what was happening. She then stood on a public sidewalk and criticized the officers' actions and recorded the arrest on her cell phone. For that, DPD officers arrested her. The officers proceeded to unlawfully search Ms. Kantor. The officers also instituted baseless charges against her. She was ultimately acquitted of the meritless charges instituted against her. Despite it being clear that the officers violated her constitutional rights, no DPD officer was disciplined for their unconstitutional actions toward

Ms. Kantor. Ms. Kantor filed a federal lawsuit and Denver paid $100,000 to settle Ms. Kantor's claims.

51.     On May 28, 2020, Agazi Abay, Gabriel Thorn, Amy Schneider, Michael McDaniel, and other similarly situated Plaintiffs protested in Denver to express their outrage at the death of George Floyd and other acts of violence perpetrated by police officers against the African American community. During the demonstration, DPD officers violated their First Amendment right to free speech and their Fourth Amendment right against excessive force by using pepper spray, pepper balls, rubber bullets, flashbang grenades, and tear gas to punish them for demonstrating against police brutality. None of the officers involved were disciplined for their unconstitutional actions.

52.     On May 28, 2020, Michael Acker, a young black college student, was peacefully protesting in a march that was criticizing DPD officers. At one point during the protest, without any warning whatsoever, DPD officers began shooting pepper balls at the protesters, including Mr. Acker. Mr. Acker put on a gas mask that someone had given him and ran to help a woman who was being brutally pelted with pepper balls from a range of approximately fifteen feet. He continued acting as a medic to other protesters suffering the effects of the chemical agents unleashed by DPD until the group began retreating and Mr. Acker followed. As he was retreating, Mr. Acker raised his fist in the air. Immediately, and with no warning, one DPD officer fired a Kinetic Impact Projectile ("KIP") at Mr. Acker's head, striking him in his right eye. It shattered the glass eye piece in his gas mask. He feared he would lose his eye. Had he not been wearing a gas mask, he likely would have. He received twelve stitches to close wounds on his forehead, nose, and upper eyelid, and doctors had to remove pieces of glass and debris from

his eye. None of the officers involved were disciplined for their unconstitutional actions. Mr. Acker filed a federal lawsuit and Denver paid Mr. Acker $500,000 to settle his claims.

53.     On May 28, 2020, while he was covering a protest rally at the State Capitol. Hyoung Chang, a credentialed press photographer for *The Denver Post*, was struck two times by pepper-ball rounds fired by law enforcement personnel under the control of the DPD while he was photographing police conduct. One round cut Chang's arm. The other shattered his press badge that was hanging around his neck. Mr. Chang was quoted after the event as saying, "If it was one shot, I can say it was an accident. I'm very sure it was the same guy twice. I'm very sure he pointed at me*."* None of the officers involved were disciplined for their unconstitutional actions.

54.     On May 29, 2020, DPD officers shot Gabriel Thorn in the head with a KIP while he was at a protest criticizing DPD officers. Mr. Thorn is a veteran who served in the United States Armed Forces. Several times while Mr. Thorn was attempted to assist other injured people, DPD officers targeted him and shot pepper balls. While at the protest, Mr. Thorn observed a largely peaceful protest but saw DPD officers utilize rubber bullets, tear gas, flash bang grenades, and pepper balls. The protesters were attacked indiscriminately. Mr. Thorn also observed DPD officers aiming at bodies and heads when firing rubber bullets. During the protest, Mr. Thorn was struck with pepper balls, rubber bullets, and was tear gassed multiple times. When Mr. Thorn was struck with rubber bullets, as with many others, he was struck in the head. Fortunately, he was wearing a helmet at that time. None of the officers involved were disciplined for their unconstitutional actions.

55.     On May 29, 2020, officer shot Andy Sannier in the chest with a KIP without warning while in downtown Denver during the protests. Mr. Sannier was walking home

downtown that evening, when he saw a Black man yelling at (but not threatening) officers. A white couple started arguing with the Black man who was yelling at the officers. Mr. Sannier stopped and recorded this with his cell phone from a comfortable distance. DPD officers opened fire on the people arguing, and, seeing that Mr. Sannier was recording them, shot him in the chest with a pepper ball. None of the officers involved were disciplined for their unconstitutional actions.

56.     On May 29, 2020, in the afternoon, DPD officers shot Megan Matthews in the head with a KIP while she was participating in a peaceful protest near the Capitol criticizing DPD officers. When DPD officers shot her in the head, Ms. Matthews was standing alone and not engaged in any violence or property destruction. When hit with the KIP, she immediately blacked out. When she woke up, her face was covered in blood. A friend then carried Ms. Matthews to a grassy area near the State Capitol, where she was bandaged by a doctor and later loaded into an ambulance. None of the officers involved were disciplined for their unconstitutional actions. Ms. Matthews filed a federal lawsuit and Denver paid Ms. Matthews $575,000 to settle her claims.

57.     On May 29, 2020, at approximately 8:15 p.m., a credentialed cameraman for KMGH-TV/Channel 7 was struck four times in the chest by KIPs fired by DPD officers while the cameraman was recording police conduct. An additional projectile paint ball hit the front lens of his conspicuous professional-grade video camera, which was at head level. None of the officers involved were disciplined for their unconstitutional actions.

58.     On May 30, 2020, Jeremy Jojola, an on-air correspondent for KUSA-TV/9News was shot with a less-lethal projectile round while standing beside a professional cameraman from

that station who was recording police conduct. The round struck Mr. Jojola's backpack. None of the officers involved were disciplined for their unconstitutional actions.

59.     On May 30, 2020, Lindsay Fendt, a freelance reporter and photographer, was standing in a group of press photographers recording police conduct when a DPD officer kicked a pepper gas canister directly into her face. None of the officers involved were disciplined for their unconstitutional actions.

60.     On May 30, 2020, DPD officers shot Michael McDaniel in the head with pepper balls without warning while he attended a protest rally criticizing DPD officers. Mr. McDonald was simply peacefully attending the protest when he was shot without warning. None of the officers involved were disciplined for their unconstitutional actions.

61.     On May 30, 2020, DPD officers shot Elizabeth Epps in the face with a pepper ball without warning while she was attending a protest that was criticizing DPD officers and recording police activity. DPD officers also shot Ms. Epps with rubber bullets during a peaceful protest in front of the Capitol, after tear gassing and pepper-spraying the crowd without warning. A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was wearing and wounding her face. None of the officers involved were disciplined for their unconstitutional actions. Ms. Epps was awarded $1,000,000 by a jury of her peers for the DPD officers' violation of her First and Fourth Amendment rights.

62.     On May 30, 2020, DPD officers shot Jax Feldmann in the eye with a rubber bullet without warning because they perceived he was attending a protest that was criticizing DPD officers. There were no large groups of protesters nearby when Mr. Feldmann was shot and no one near him yelled at or throw anything at the DPD officers on the truck, which was marked with the DPD logo. His friend called 911 and Mr. Feldmann was transported to Denver Health

via ambulance. Alone in the hospital, Mr. Feldman was told by doctors that they would have to perform emergency surgery to save his eye and doctors performed that surgery, however, Mr. Feldmann will never regain his full vision. None of the officers involved were disciplined for their unconstitutional actions.

63. On May 30, 2020, DPD officers shot former Major League Baseball star Dale Murphy's son in the eye with a pepper ball without warning while he was attending a protest criticizing DPD officers. After being shot, he was taken to the emergency room. None of the officers involved were disciplined for their unconstitutional actions.

64. On May 30, 2020, DPD officers without warning shot Russell Strong in the head with a baton round. Mr. Strong was protesting DPD officers near Civic Center Park and carrying a sign that read "No justice, No peace." Shortly after 6 p.m., Mr. Strong was hit in the face with a baton round. The force of the baton round knocked him out. As a result of this use of force, Mr. Strong required several facial reconstructive surgeries to repair broken bones around his eye and to realign the right side of his jaw. Mr. Strong lost his right eye because of the use of force by DPD officers. When he was shot, Mr. Strong was simply peacefully protesting and was not engaging in any violence or property destruction. None of the officers involved were disciplined for their unconstitutional actions. Mr. Strong filed a federal lawsuit and Denver paid $550,000 to settle Mr. Strong's claims.

65. On May 30, 2020, Mercii Thomas was shot in the face with a rubber bullet by DPD officers without warning while she attended a protest criticizing DPD officers. Ms. Thomas joined the peaceful protests that had been happening in Denver since the video of the brutal police murder of George Floyd had been released a few days earlier. As Ms. Thomas was protesting, she looked around her and was horrified to see the police firing pepper balls and

rubber at protesters who were lying on the ground. She began filming the police violence against peaceful protesters with her phone. As she did so, she observed other people who were recording with their phones being targeted with rubber bullets and pepper balls. It occurred to her that filming the police could be making her a target too. Suddenly, Ms. Thomas felt a massive blow to her forehead. Everything went black as she fell to the ground and lost consciousness. As she regained consciousness, she found herself being picked up and taken to a curb by medics. She lay on the ground bleeding profusely from her head while the medics worked on applying a tourniquet. Then she felt a sudden burst of pain on her lower back side and realized she had been hit by police again, this time with a pepper ball. Ms. Thomas was terrified, bleeding on the ground, and still police were targeting her with projectiles. She eventually received medical care for her injuries. None of the officers involved were disciplined for their unconstitutional actions. Ms. Thomas filed a federal lawsuit and Denver paid $500,000 to settle Ms. Thomas' claims.

66.    On May 30, 2020, DPD officers shot Darrell Hampton in the face with a pepper ball without warning. Mr. Hampton was peacefully protesting, and filming, DPD officers on the sidewalk near the Capitol in the afternoon. A number of DPD officers were standing on the back of a DPD pickup truck, carrying pepper ball guns. As the truck was driving away, one officer decided to shoot Mr. Hampton in the face with a pepper ball for no apparent reason. There was no violence or property destruction happening; Mr. Hampton was simply standing on the sidewalk filming the protest and the officers. None of the officers involved were disciplined for their unconstitutional actions. Mr. Hampton filed a federal lawsuit and Denver paid $175,000 to settle Mr. Hampton's claims.

67.    On May 31, 2020, Gabe Schlough was shot in the face with a rubber bullet by DPD officers without warning while he was attending a protest criticizing DPD officers. When

Mr. Slough arrived, he saw a crowd of two or three hundred people facing down a line of police. Officers were standing just a little bit more than shoulder to shoulder apart with full riot gear, with their face shields and full protective armor on. Mr. Slough, sensing a conflict, moved up toward the front of the crowd and began to tell people who didn't have eye coverings to watch their eyes and protect their face. DPD officers then shot a woman in the chest with a tear gas canister right next to Mr. Slough. Mr. Slough bent down to help the woman and, while doing so, covered the tear gas canister with a cone. As soon as he did this, officers shot Mr. Slough in the face and chest with rubber bullets. Mr. Slough described the sensation as getting hit with a baseball bat. He helped the woman back away from the line of DPD officers and, as he did so, the other individuals he had attended the protest with told him that his chin was falling off. The rubber bullet had left a gaping wound on his chin, and blood was pouring down onto the front of his shirt. Mr. Slough went to the hospital where he required twenty-two stitches to close the wound on his chin. He still experiences pain from this wound and required plastic surgery for it to heal properly. None of the officers involved were disciplined for their unconstitutional actions. Mr. Schlough filed a federal lawsuit and Denver paid $575,000 to settle Mr. Schlough's claims.

68.     On May 31, 2020, while attending a protest criticizing DPD officers, Zachary Packard was shot in the head with a KIP by DPD officers without warning. Mr. Packard arrived at the protests on streets surrounding the Capitol at about 8 p.m. DPD officers formed lines on two perpendicular streets and began closing in on the groups of protesters. DPD officers then started firing tear gas. Mr. Packard attempted to kick one tear gas canister away from the group of protesters near him. As he stepped off the sidewalk, Mr. Packard was hit in the head with a projectile shot by DPD officers. He was immediately knocked unconscious. DPD officers did not issue a warning before shooting Mr. Packard. Bystanders carried Mr. Packard from the sidewalk

over into a patch of grass. When he returned to consciousness, a friend took him to the hospital. A CAT scan later revealed that Mr. Packard suffered a fractured skull and jaw, two fractured discs, and bleeding in his brain. Mr. Packard remained at the hospital for about one week. None of the officers involved were disciplined for their unconstitutional actions. Mr. Packard filed a federal lawsuit and jury awarded Mr. Packard $3,500,000 while finding that Denver officers violated his First and Fourth Amendment rights.

69.     On May 31, 2020, DPD officers shot Youssef Amghar in the head and chest with pepper balls without warning while he attended a protest criticizing DPD officers. Mx. Amghar was with other peaceful protesters on the corner of Colfax and Lincoln. Protesters were chanting, "Hands up, don't shoot," and holding signs. Mx. Amghar was standing on the sidewalk. There was a line of DPD officers on Colfax. Mx. Amghar stood there with their hands up. Someone else not near them in the crowd threw a water bottle at the officers. The DPD officers immediately began shooting into the crowd with pepper balls. They did this without warning or giving any orders. At first, the DPD officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Mx. Amghar, even though they were standing still with their hands up. The DPD officers first shot them in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up. The DPD and/or APD officers shot them approximately fourteen times. The DPD officers did not give any orders before, during, or after this incident. No one told Mx. Amghar to move back or gave them any other orders. Mx. Amghar was so upset at the DPD officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?" Then DPD officers began throwing tear gas canisters at their feet. After a couple minutes, Mx. Amghar walked away and took cover behind a tree. None of the officers involved

were disciplined for their unconstitutional actions. Mx. Amghar filed a federal lawsuit and Denver paid $250,000 to settle Mx. Amghar's claims.

70.     On May 31, 2020, Alex Burness of *The Denver Post*, was fired upon, without warning, by law enforcement and shot in the head and abdomen with pepper balls while covering a protest that criticized DPD officers. He sustained a contusion on his head and right abdomen. None of the officers involved were disciplined for their unconstitutional actions.

71.     On May 31, 2020, DPD officers shot Darian Tindall in the chest with pepper balls without warning while attending a protest criticizing DPD officers. Ms. Tindall was hit in the chest with a pepper ball while marching on Colfax Avenue. Her hands were up above her head when she was shot, and she didn't see the projectile coming or anticipate the intense pain. She was given no warning by DPD. None of the officers involved were disciplined for their unconstitutional actions.

72.     On June 1, 2020, DPD officers shot Ambrose Cruz in the head and chest with KIPs without warning while Mr. Cruz was attending a protest criticizing DPD officers. As a photographer and freelance journalist, Mr. Cruz documented the protests as well as the police response. As he was doing so, one DPD officer shot Mr. Cruz in the face with pepper balls. The DPD officer hit him three times in the eye area and knocked his glasses off. A female DPD officer told him, "If you don't fucking get on the ground, I'm going to fucking kill you," or words to that effect. Even though Cruz stopped and was on the ground, the other DPD officer continued firing pepper balls at him, including at the back of his head. The DPD officer who had been repeatedly firing pepper balls at Cruz at close range taunted him, saying things like, "What happened to you? It looks like your wife beat you. I'd say that was two days old, this must have happened another night." Mr. Cruz's eye was bleeding, swollen shut, and bruised. He could not

open his eye. A month after the attack, he still has light sensitivity and other problems with his eyesight. None of the officers involved were disciplined for their unconstitutional actions.

73.     On June 1, 2020, members of the Colorado Freedom of Information Coalition, Colorado Press Association Network, Colorado Broadcasters Association, and Colorado Pro Chapter of the Society of Professional Journalists reported seven journalists or reporters had been subjected to the use of force by DPD officers while filming police conduct in Denver. DPD officers hit these reporters and with pepper balls, projectiles, or tear gas simply for being present at protests that were criticizing DPD officers and documenting (through filming and photography) their brutal actions.

74.     On June 4, 2020, four persons who participated in the George Floyd protests in Denver sued Defendant Denver, alleging that DPD officers' actions violated the First and Fourth Amendments. After a hearing on the matter, Judge R. Brooke Jackson of the United States District Court for the District of Colorado issued a temporary restraining order. In doing so, Judge Jackson reminded the DPD that "people have an absolute right to demonstrate and protest the actions of governmental officials, including police officers. It is one of the many freedoms on which this country was built." In response to the evidence presented, Judge Jackson was unequivocal about the behavior of DPD officers toward protesters who criticized them, calling it "disgusting." Judge Jackson went on to conclude that there was a "strong likelihood" that DPD officers had engaged in excessive force in violation of the Fourth Amendment. Judge Jackson made this determination based on video evidence that showed "police conduct at the demonstrations" where "the officers had ample time for reflection and were not dealing with dangerous conditions" yet still "attacked [protesters] with rubber bullets, tear gas, etc.… solely on the basis of their presence at the demonstrations, their viewpoint, or their attempts to render

treatment to injured protesters." In the end, Judge Jackson found that DPD officers had targeted "peaceful demonstrators, journalists, and medics... with extreme tactics meant to suppress riots, not to suppress demonstrations."

75.     On August 22, 2021, Brenton Benson and his wife, Regan Benson, were driving near the 800 block of South Huron in Denver, Colorado. When Mr. and Mrs. Benson saw multiple DPD officers sitting in their police vehicles in a private parking lot, they pulled over to the side of the road and parked. Mrs. Benson then began filming the officers. Because the officers did not appreciate being scrutinized, and because they wanted to personally retaliate against Mrs. Benson who they knew was a longtime critic of DPD and their response to the homelessness crisis, the DPD officers conspired to retaliate against Mr. and Mrs. Benson. They concocted a plan to cite Mr. Benson for blocking the roadway, which was obviously bogus, to intimidate Mr. and Mrs. Benson and punish them for engaging in First Amendment-protected activity. After giving Mr. Benson a bogus citation for allegedly blocking the roadway, the officers left Mr. Benson parked in the exact same spot they claimed was blocking the roadway. This was just the first indication that the only basis for the charges levied against Mr. Benson was retaliation. At a later court date, a Denver County court judge found that Defendants had no basis to cite Mr. Benson and summarily dismissed the charges against him. Despite the fact that he had been caught red-handed, one of the DPD officers continued his retaliatory actions. He hid from the judge, and Mr. Benson, that he had placed a hold on Mr. Benson's driver's license, which required that Mr. Benson had to re-test at the DMV in order to keep an active license. Because Mr. Benson did not know about this hold, his license expired. None of the officers involved were disciplined for their unconstitutional actions.

76.     Almost every one of these representative cases resulted in Defendant Denver paying to significant sums to settle the claims against it for free speech violations, retaliation, and malicious prosecution, yet Defendant Denver failed to discipline its officers for violating the rights of those who criticize and film them. The facts surrounding Mr. Manchas' case make apparent that Defendant Denver continues to condone such behavior by its police officers. This custom and practice caused the violation of Mr. Manchas' constitutional rights, and Defendant Denver was on notice of this custom and practice based on these past incidents and others, which resulted in litigation and significant payouts by Defendant Denver at taxpayer expense.

**Defendant Denver's unconstitutional customs and practices caused the violation of Mr. Manchas' constitutional rights.**

77.     The Individual Defendants' unlawful conduct, as set forth in detail herein, was in accordance with the above-described customs and practices condoned and ratified by Defendant Denver that were, even if not authorized by written law or express municipal policy, so permanent and well established as to constitute a custom or usage with the force of law.

78.     Defendant Denver's policies, customs, or practices in failing to properly train and supervise its employees were a moving force and proximate cause of their violation of Mr. Manchas' constitutional rights.

79.     Defendant Denver's policies, customs, or practices in failing to properly train and/or supervise its employees were the moving force and proximate cause of the violation to Mr. Manchas' constitutional rights.

80.     The customs, policies, and practices of Defendant Denver of encouraging, condoning, tolerating, and ratifying the retaliation against those who record at public places or criticize public officials, as described herein, was the moving force behind, and proximate cause of, the violation to Mr. Manchas' constitutional rights.

81.     The actions of Defendant Denver as described herein deprived Mr. Manchas of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused her other damages.

82.     The acts or omissions of Defendant Denver caused Mr. Manchas damages in that he suffered physical and mental pain, among other injuries, damages, and losses.

**Defendant Denver was deliberately indifferent to its unconstitutional customs and practices.**

83.     Through Defendant Denver's continuous ratification of its officers' unconstitutional conduct, as described above, Defendant Denver has condoned the conduct of its officers and sent the message that it will not discipline them for violating the Constitution.

84.     Defendant Denver knew or had constructive knowledge, based on the customary actions of its officers described above and its condoning of those actions, that its officers would retaliate against those who criticized and/or recorded the police, like Mr. Manchas.

85.     Defendant Denver could have and should have pursued reasonable methods for prohibiting the widespread customs and practices outlined above, but affirmatively chose not to do so by refusing to discipline its officers who unconstitutionally retaliated against those exercising their First Amendment rights.

86.     Defendant Denver could have and should have pursued reasonable methods for disciplining its officers to make clear that it does not condone such constitutional violations, but failed to do so.

87.     Defendant Denver knew, or should have known, that its employees would retaliate against Mr. Manchas for recording police activity and speaking critically of police officers, thereby violating Mr. Manchas' constitutional rights.

88.     Defendant Denver was deliberately indifferent to Mr. Manchas' constitutional rights, because Defendant Denver knew that individuals in Mr. Manchas' position would be at a substantial risk of suffering dangerous consequences from Defendant Denver condoning and establishing the multiple unconstitutional customs and practices outlined above.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Freedom Of Speech
*Against All Defendants*

89.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

90.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

91.     Defendants are "persons" under 42 U.S.C. § 1983.

92.     Plaintiff was engaged in First Amendment-protected expression by both protesting police action and recording police officers in the performance of their official duties.

93.     The actions of Defendants can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

94.     Plaintiff's expression was on a matter of public concern and did not violate any law.

95.     Plaintiff's expression occurred at a traditional public forum.

96.     Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression.

97.     Defendants' actions were not a reasonable time, place, and manner restriction on speech.

98.     At the time when Defendants stopped Plaintiff from speaking, expressing herself, and filming, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to film, express herself, and speak freely. Any reasonable law enforcement officer knew or should have known of this clearly established right.[1]

99.     Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

100.    Defendants stopped Plaintiff from filming and engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

101.    Defendant Denver has a custom, practice or policy of tolerating violations of the First Amendment of the United States.

102.    The actions of the Individual Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

103.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

---

[1] At the time of this incident, the right to record police activity at public places is clearly established, both by state statute and the broad consensus of authority from other Circuits. *See, e.g.,* C.R.S. § 13-21-128; *Fields v. City of Phila.*, 2017 U.S. App. LEXIS 12159 (3d Cir. July 7, 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017); *Bowens v. Superintendent of Miami S. Beach Police Dep't*, 557 Fed. App'x 857, 863 (11th Cir. 2014); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Ci r. 2000); *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014); *Adkins v. Limtiaco*, 537 Fed. App'x 721, 722 (9th Cir. 2013); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 599–600 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78, 79 (1st Cir. 2011); *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).

104.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

105.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after his arrest, and other compensatory and special damages.

106.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Retaliation
*Against All Defendants*

107.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

108.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

109.    Defendants are "persons" under 42 U.S.C. § 1983.

110.    Plaintiff was engaged in First Amendment-protected expression by questioning, opposing, and filing the conduct of Defendant officers.

111.    Plaintiff's expression was on a matter of public concern and did not violate any law.

112.    Plaintiff's expression occurred at a traditional public forum.

113.    Defendants jointly and on their own accord responded to Plaintiff's First Amendment protected activity with retaliation.

114.    Defendants' actions against Plaintiff were a content- and/or viewpoint-based restriction on speech.

115.    Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment protected activity.

116.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights.

117.    At the time when Defendants retaliated against Plaintiff for exercising his First Amendment rights, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to be free from retaliation. Any reasonable law enforcement officer knew or should have known of this clearly established right.

118.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

119.    Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

120.    Defendant Denver has a custom, practice or policy of tolerating its officers' retaliatory violations of the First Amendment of the United States and Colorado Constitutions.

121.    The actions of Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

122.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

123.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

124.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

125.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth Amendment Violation — Unlawful Arrest
*Against Defendants Denver, Stewart, and Sanchez*

126.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

127.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

128.     Defendants are "persons" under 42 U.S.C. § 1983.

129.     Defendants did not have probable cause or any other legal basis to believe that Plaintiff had committed or was committing any violating of the law prior to directing Plaintiff to step back and arresting her.

130.     Defendants had no warrant authorizing them to contact Plaintiff.

131.     Defendants who did not personally detain or arrest Plaintiff failed to intervene to prevent the other Defendants from searching Plaintiff without a warrant, probable cause, or exigent circumstances.

132.     No legally recognizable exigent circumstances existed which would have justified or permitted Defendants' conduct.

133.     Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

134.     Defendants' intentional, willful, and wanton seizure of Plaintiff, as described herein, was solely based on Plaintiff's exercise of his First Amendment rights.

135.     Defendant Denver has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

136.     Defendant Denver's customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

137.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

138.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment Violation — Unlawful Search**
*Against Defendants Denver, Stewart, and Sanchez*

139.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set

forth herein.

140.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

141.     Defendants are "persons" under 42 U.S.C. § 1983.

142.     Plaintiff has a legitimate expectation of privacy in his body and his property being free from unreasonable governmental search.

143.     Defendants had no warrant authorizing any such search of Plaintiff's body or property.

144.     No legally recognizable exigent circumstances or other legal justification existed which would have justified or permitted Defendants' conduct.

145.     Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

146.     Defendants who did not personally search Plaintiff failed to intervene to prevent the other Defendants from searching Plaintiff without reasonable suspicion, a warrant, or exigent circumstances.

147.     Defendants engaged in these actions intentionally, willfully, and wantonly.

148.     Defendant Denver has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

149.     Defendant Denver's customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

150.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to

non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff

suffered, and other compensatory and special damages.

151.    Defendants' intentional actions or inactions as described herein intentionally

deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by

the Constitution of the United States of America.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment Violation — Malicious Prosecution**
*Against All Defendants*

152.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set

forth herein.

153.    Defendants acted under color of state law, and within the course and scope of

their employment, in their capacities as law enforcement officers at all times relevant to the

allegations in this Complaint.

154.    Defendants are "persons" under 42 U.S.C. § 1983.

155.    Defendants initiated charges against Plaintiff knowing that there was no basis for

those charges or probable cause to believe Plaintiff had committed any crime.

156.    No probable cause supported Plaintiff's original arrest, confinement, or

prosecution.

157.    Defendants' motivation was not to bring to justice a person thought to have

committed a crime, but rather for the purpose of punishing Plaintiff and covering up their

unlawful conduct.

158.    Defendants acted with malice in initiating the charges against Plaintiff and

causing his continued prosecution.

34

159.     Defendants engaged in the above actions and omissions knowingly, maliciously, willfully and wantonly.

160.     Defendants who did not personally initiate the malicious prosecution of Plaintiff failed to intervene to prevent the other Defendants from doing so.

161.     Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

162.     The charges against Plaintiff resulting from the actions/omissions of Defendants described herein were dismissed; thus, the original action against Plaintiff terminated in his favor.

163.     Defendants' actions caused Plaintiff damages. As a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

164.     Defendant Denver has a custom, practice, or policy of tolerating violations of the Fourth Amendment of the United States Constitution, particularly condoning malicious prosecutions initiated by police officers without probable cause.

165.     Defendant Denver's customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

### SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 2000aa
### Privacy Protection Act
*Against Defendant Denver*

166.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

167.    While arresting Plaintiff, Defendants seized Plaintiff's camera.

168.    Plaintiff had a purpose to disseminate the video recording he took of Defendants' actions.

169.    Plaintiff planned to disseminate his recording online thereby making the dissemination of the recording to involve and affect interstate commerce.

170.    There was no reason to believe that the immediate seizure of Plaintiff's camera was necessary to prevent the death of, or serious injury to, a human being.

171.    There was no reason to believe that the destruction of Plaintiff's recording was necessary to prevent the death of, or serious injury to, a human being.

172.    As a direct and proximate result of Defendants' seizure of Plaintiff's camera, Plaintiff suffered damages.

**SEVENTH CLAIM FOR RELIEF[2]**
**C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 10**
**Freedom of Speech**
*Against Defendants Stewart, Sanchez, and Simmons*

173.    Plaintiff hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

174.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

175.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

---

[2] Plaintiff bring these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

176.     The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10.

177.     The free speech rights protected by Colo. Const. Art. II, Section 10 are more expansive than those protected by the First Amendment to the United States Constitution.

178.     Plaintiff were engaged in protected speech.

179.     Plaintiff's speech was on a matter of public concern and did not violate any law.

180.     Defendants' conduct would chill a person of ordinary firmness from exercising his free speech rights.

181.     Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiff's speech.

182.     Plaintiff's speech occurred at a traditional public forum.

183.     Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

184.     As a legal and proximate result of Defendants' actions or omissions described herein, Plaintiff has suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

**EIGHTH CLAIM FOR RELIEF[3]**
**C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 10**
**Freedom of Speech – Retaliation**
*Against Defendants Stewart, Sanchez, and Simmons*

---

[3] Plaintiff bring these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

185.    Plaintiff hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

186.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacity as a law enforcement officer at all times relevant to the allegations in this Complaint.

187.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

188.    The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10.

189.    The free speech rights protected by Colo. Const. Art. II, Section 10 are more expansive than those protected by the First Amendment to the United States Constitution.

190.    Plaintiff were engaged in protected speech.

191.    Plaintiff's speech was on a matter of public concern and did not violate any law.

192.    Defendants' conduct would chill a person of ordinary firmness from exercising his free speech rights.

193.    Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiff's speech.

194.    Plaintiff's speech occurred at a traditional public forum.

195.    Defendants responded to Plaintiff's protected speech activity with retaliation.

196.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his free speech rights.

197.    Defendants sought to punish Plaintiff for exercising their free speech rights, to silence their future speech, to stop them from continuing to speak, and to restrict their freedom of expression, along with the future speech and expression of others.

198.    Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in protected free speech activity.

199.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

200.    As a legal and proximate result of Defendants' actions or omissions described herein, Plaintiff has suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

### NINTH CLAIM FOR RELIEF[4]
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 7
### Unlawful Arrest
*Against Defendants Stewart and Sanchez*

201.    Plaintiff hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

202.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

---

[4] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

203.     Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

204.     Plaintiff had a protected interest under the Colorado Constitution against being unlawfully arrested.

205.     Defendants did not have probable cause or any other legal basis to believe that Plaintiff had committed or was committing any violating of the law prior to directing Plaintiff to step back and arresting her.

206.     Defendants had no warrant authorizing them to contact Plaintiff.

207.     Defendants who did not personally detain or arrest Plaintiff failed to intervene to prevent the other Defendants from searching Plaintiff without a warrant, probable cause, or exigent circumstances.

208.     No legally recognizable exigent circumstances existed which would have justified or permitted Defendants' conduct.

209.     Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

210.     Defendants' intentional, willful, and wanton seizure of Plaintiff, as described herein, was solely based on Plaintiff's exercise of his free speech rights.

211.     Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

212.     As a legal and proximate result of Defendants' actions or omissions described herein, Plaintiff has suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

**TENTH CLAIM FOR RELIEF[5]**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 7**
**Unlawful Search**
*Against Defendants Stewart and Sanchez*

213.    Plaintiff hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

214.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

215.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

216.    Plaintiff had a protected interest under the Colorado Constitution against being unlawfully searched.

217.    Plaintiff has a legitimate expectation of privacy in his body and his property being free from unreasonable governmental search.

218.    Defendants had no warrant authorizing any such search of Plaintiff's body or property.

219.    No legally recognizable exigent circumstances or other legal justification existed which would have justified or permitted Defendants' conduct.

220.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

---

[5] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

221.     Defendants who did not personally search Plaintiff failed to intervene to prevent the other Defendants from searching Plaintiff without reasonable suspicion, a warrant, or exigent circumstances.

222.     Defendants engaged in these actions intentionally, willfully, and wantonly.

223.     As a legal and proximate result of Defendants' actions or omissions described herein, Plaintiff has suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

### ELEVENTH CLAIM FOR RELIEF[6]
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 7 & Colo. Const. Art. II, Section 25
### Malicious Prosecution
*Against Defendants Stewart, Sanchez, and Simmons*

224.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

225.     Defendants acted under color of state law, and within the course and scope of his employment, in his capacity as a law enforcement officer at all times relevant to the allegations in this Complaint.

226.     Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

227.     Plaintiff had a protected interest under the Colorado Constitution against being subjected to malicious prosecution.

228.     Defendants initiated charges against Plaintiff, knowing that there was no basis for those charges or probable cause to believe Plaintiff had committed any crime.

---

[6] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

229.   No probable cause supported Plaintiff's original citation and prosecution.

230.   Defendants' motivation was not to bring to justice a person thought to have committed a crime but for the purpose of punishing Plaintiff for engaging in protected speech activity.

231.   Defendants acted with malice in initiating the charges against Plaintiff and causing his continued prosecution.

232.   The charges against Plaintiff resulting from the actions/omissions of Defendants described herein were dismissed under circumstances indicating innocence; thus, the original action against Plaintiff terminated in his favor.

233.   Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the protected rights of Plaintiff.

234.   Defendants who did not personally initiate the malicious prosecution of Plaintiff failed to intervene to prevent the other Defendants from doing so.

235.   As a legal and proximate result of Defendants' actions or omissions described herein, Plaintiff has suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

a.   All appropriate relief at law and equity;

b.   Declaratory relief;

c.   Injunctive relief;

d.   Actual economic damages as established at trial;

e.   Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

f.   Punitive damages for all claims as allowed by law in an amount to be determined at trial;

g.   Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

   1.   Issuance of a formal written apology from each Defendant to Plaintiff;

   2.   The imposition of policy changes designed to avoid future similar misconduct by Defendants;

   3.   Mandatory training designed to avoid future similar misconduct by Defendants;

h.   Pre-judgment and post-judgment interest at the highest lawful rate;

i.   Attorney's fees and costs; and

j.   Such further relief as justice requires.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 25th day of October 2023.

NEWMAN | MCNULTY

*/s/ Andy McNulty*
Andy McNulty
Mari Newman
1490 N. Lafayette Street
Suite 304
Denver, Colorado 80218

(720) 850-5770
andy@newman-mcnulty.com
mari@newman-mcnulty.com

COUNSEL FOR PLAINTIFF