**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Regina M. Rodriguez**

Civil Action No. 23-cv-02789-RMR-STV

ZACHARY MANCHAS,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
JOSEPH STEWART, in his individual capacity,
SELENA BIBIANA FAILE, in her individual capacity,
JASON SIMMONS, in his individual capacity,

Defendants.

---

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Zachary Manchas ("Plaintiff") was arrested and detained by the individual Defendants in this case on June 12, 2022. He brings several claims for relief under 42 U.S.C. § 1983, the Privacy Protection Act (42 U.S.C. § 2000aa), and Colorado Revised Statute § 13-21-131. ECF No. 45 at 29-46. Defendants collectively request the Court grant summary judgment in their favor on all of Plaintiff's claims. ECF No. 105 at 21.[1] For the reasons stated below, Defendants' motion for summary judgment is granted in part and denied in part.

[1] Plaintiff filed a response to Defendants' motion for summary judgment, ECF No. 110, and Defendants filed a reply, ECF No. 112. The Court notes that Plaintiff's response exceeds the Court-ordered limit of 27 pages. ECF No. 109. Additionally, Plaintiff's response does not comply with Civ. Practice Standard 10.1(a) or (b). Although it may, the Court will not strike the non-compliant briefing filed by Plaintiff.

## I. BACKGROUND[2]

At around 2:00 a.m. on June 12, 2022, Plaintiff was leaving Herb's, a bar located on Larimer Street in Denver, Colorado. He had consumed about five or six drinks over the span of five to six hours. At the same time, Denver Police Department Officers, Defendants Selena Faile and Joseph Stewart, were working the night shift patrolling crowds leaving bars and other establishments. Faile and Stewart were stationed at a parking lot on 20th and Market Street when they observed a Volkswagen Jetta with a handgun visible in plain sight in the driver's side door. The officers also saw the Volkswagen leave the parking lot without signaling when it turned. As a result, Defendants Faile and Stewart decided to conduct a high-risk traffic stop, which involves pulling over a vehicle and having the occupants exit at gunpoint.

After the Volkswagen pulled over on Lawrence Street, Officers Faile and Stewart stopped the police vehicle behind it. Faile exited the police vehicle from the driver's side, and Stewart exited from the passenger's side. Both officers had their guns pointed at the Volkswagen and ordered the driver to turn off the car. At this time, Plaintiff was walking on the sidewalk on Lawrence Street, witnessed the officers conducting the high-risk traffic stop, and began recording the incident. The officers ordered the driver of the Volkswagen to exit the vehicle with his hands up. At 2:01 a.m., Faile ordered the driver on his knees and handcuffed him. ECF No. 107, Ex. G at 01:46-58. About a minute later at 2:02 a.m., the officers asked the driver if there were any guns in the Volkswagen, and he responded

[2] The Court relies on the parties' Statement of Undisputed Facts, ECF No. 102, and the body worn camera ("BWC") footage from Defendants Faile, Stewart, and Simmons, ECF No. 107, Exs. G, H, and I, respectively.

that he had an unloaded weapon in the driver side door. *Id.* at 02:10-17. The driver was then placed in the back of the police vehicle and transported to the Downtown Detention Center.

Throughout the high-risk stop, Plaintiff was standing nearby, video-recording the officers on his phone, and yelling at the officers. While the officers ordered the Volkswagen driver to exit the car, Plaintiff made comments to the officers, such as "put your f—ing gun down" and "what is wrong with you." ECF No. 107, Ex. G at 00:37-00:47. Officer Stewart told Plaintiff to "shut up," while both officers continued with the high-risk traffic stop and placed the Volkswagen driver in handcuffs. *Id.* at 00:54-01:50. Throughout the incident, Plaintiff continued to pepper the officers with comments and questions. *Id.* When Officers Stewart and Faile were handcuffing the Volkswagen driver, Plaintiff yelled more expletives towards the officers. *Id.* at 01:51-53.

As Faile guided the Volkswagen driver into the back of the police vehicle, Plaintiff asked Stewart for his name and badge number. *Id.* at 02:08-10. Faile continued the investigation by asking the Volkswagen driver if there were any weapons in his car. *Id.* at 02:10-2:16. Plaintiff continued to pester Stewart for his name and badge number. *Id.* at 02:36-38. Shortly afterwards, after the Volkswagen driver was in the police vehicle, both officers asked Plaintiff to stand back and told him that he was interfering with an active investigation. *Id.* at 02:51-03:01. Plaintiff moved according to the officers' orders but continued to ask for their names and badge numbers at the same time. *Id.* at 03:01-20. Eventually, around 2:03 a.m., Officers Stewart and Faile put Plaintiff in handcuffs and informed him that he was detained. *Id.* at 03:21-54. Around a minute later, while Plaintiff

was detained, Faile explained that she could not perform her job while Plaintiff was "screaming" and "interfering" with the officers' ability to talk to the Volkswagen driver and passenger. *Id.* at 04:19-05:30.

While Stewart and Faile were with Plaintiff, Defendant Jason Simmons, another Denver Police Department Officer, approached the passenger side of the Volkswagen. ECF No. 107, Ex. I at 00:33-36. After patting the passenger down, Simmons determined that the Volkswagen passenger was not armed at 2:03 a.m. *Id.* at 00:49-01:17. Simmons' BWC footage shows at least four other officers, excluding Faile and Stewart, who were also on the scene. *Id.* at 01:17-24. Simmons had authority to and indeed approved Plaintiff's arrest for interference.

Plaintiff's second amended complaint contains eleven claims for relief:

1) First Amendment violation – Freedom of Speech under 42 U.S.C. § 1983 against all Defendants
2) First Amendment violation – Retaliation under 42 U.S.C. §1983 against all Defendants
3) Fourth Amendment violation – Unlawful Arrest under 42 U.S.C. §1983 against all Defendants
4) Fourth Amendment violation – Unlawful Search under 42 U.S.C. §1983 against Defendants Denver, Stewart and Faile
5) Fourth Amendment – Malicious Prosecution under 42 U.S.C. §1983 against all Defendants

6) Privacy Protection Act violation under 42 U.S.C. § 2000aa against Defendant Denver
7) Freedom of Speech violation under Colo. Rev. Stat. § 13-21-131 against all individual Defendants
8) Freedom of Speech – Retaliation violation under Colo. Rev. Stat. § 13-21-131 against all individual Defendants
9) Unlawful Arrest violation under Colo. Rev. Stat. § 13-21-131 against all individual Defendants
10) Unlawful Search violation under Colo. Rev. Stat. § 13-21-131 against Officers Stewart and Faile
11) Malicious Prosecution violation under Colo. Rev. Stat. § 13-21-131 against all individual Defendants.

ECF No. 45 at 2-26. Defendants move for summary judgment as to each of these claims, arguing: (1) Plaintiff's speech was not restricted on the basis of its content; (2) probable cause existed to arrest Plaintiff; (3) Plaintiff failed to demonstrate retaliatory animus motivated his arrest; (4) Plaintiff's prosecution did not terminate in his favor; (5) the individual Defendants have qualified immunity on the § 1983 claims; (6) Plaintiff cannot establish a policy, practice, or custom on his *Monell* claim; (7) Plaintiff cannot sustain a Privacy Protection Act claim; and (8) Plaintiff's claims under Colo. Rev. Stat. § 13-21-131 fail because he cannot establish a constitutional violation. ECF No. 105.

## II. LEGAL STANDARD

To succeed on a motion for summary judgment, the movant must demonstrate that (1) there is no genuine dispute of material fact; and (2) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When analyzing a motion for summary judgment, the court must look at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). However, the nonmoving party may not simply rest upon its pleadings at this stage; rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249.

## III. ANALYSIS

Defendants move for summary judgment on all Plaintiffs' claims and assert Individual Defendants have qualified immunity. Plaintiff contends Defendants' arguments are "too perfunctory" to succeed and that disputed issues of material fact prevent summary judgment. ECF No. 110. The Court first determines whether the Individual Defendants have qualified immunity. Then, the Court will analyze whether *Monell* liability applies to Plaintiff's § 1983 claims. Finally, the Court will review Plaintiffs' Privacy Protection Act and state-law claims.

### A. Qualified Immunity

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The privilege is an immunity from suit rather than a mere defense to liability." *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006).

Individual Defendants assert qualified immunity and argue Plaintiff's § 1983 claims against them are barred. ECF No. 105 at 17. "When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established." *Tachias v. Sanders*, 130 F.4th 836, 842 (10th Cir. 2025) (citing *Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020)). The Court may choose either

of the two prongs of the qualified immunity analysis to address first. *Id.* In this case, the Court will first consider the "clearly established" prong.

Plaintiff argues that Defendants' qualified immunity argument has been waived, because "Defendants devote half of a sentence to their argument that the Individual Defendants did not violate clearly established law" and such "cursory arguments are far too perfunctory for the court to consider in any substantive fashion." ECF No. 110 at 15. However, the burden rests on Plaintiff to negate Defendants' qualified immunity defense. *Sanchez v. Guzman*, 105 F.4th 1285, 1294 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1052 (2025). In his response, Plaintiff conclusively states that the First Amendment right to criticize police is well-established and that "the law is clearly established that officers need either a warrant or a valid exception to the warrant requirement in order to search a person." ECF No. 110 at 23 (citing *Jordan v. Jenkins*, 73 F.4th 1162, 1171 (10th Cir. 2023)). Plaintiff does not cite any part of the record in making his argument against qualified immunity.

The Tenth Circuit has explained that "the clearly established law inquiry is fact-intensive because it ordinarily focuses on determining whether there is caselaw with materially similar facts to the facts of the case before the court." *Sanchez*, 105 F.4th at 1294. "[I]n the summary-judgment context, the plaintiff is obliged to define the factual universe by reference to record evidence." *Id.* at 1296. "Absent this record-based picture of the case facts, there is no foundation for the court to conduct a clearly established law inquiry." *Id.* In *Sanchez*, the plaintiffs cited two portions of the record in the course of their briefing on the clearly established law question. *Id.* at 1297. The Tenth Circuit deemed

those citations "not enough to satisfy Plaintiff's obligation to define a record-based factual universe that [it] may use in resolving the clearly established law question." *Id.* Further, the existence of clearly established law "turns on the closeness of the fit of the facts contained in the controlling caselaw to a universe of record-based facts in the case at bar." *Id.* at 1300.

Here, Plaintiff has not defined the factual universe of this case or the closeness of the fit of the facts in the controlling case law. While the Court does not disagree that the First and Fourth Amendments provide well-known rights, the qualified immunity analysis requires Plaintiff to provide the Court with the "universe of record-based facts" to determine that a clearly established constitutional right was at issue. Plaintiff's response fails to identify which record-based facts support his claim that qualified immunity does not apply to the Individual Defendants. The Court has reviewed Plaintiff's response to Defendants' Statement of Undisputed Material Facts and Plaintiff's Statement of Additional Disputed Material Facts. ECF No. 110 at 5-14. While these facts generally allege constitutional violations, Plaintiff has not compared these facts to controlling case law in the qualified immunity context. Therefore, he has not satisfied his burden of negating the Individual Defendants' qualified immunity defense with respect to the "clearly established" prong of qualified immunity. Because both prongs must be satisfied, the Court need not analyze the "constitutional violation" prong and finds that Plaintiff has not satisfied his burden to overcome Defendants' qualified immunity. Accordingly, Defendants' Motion for Summary Judgment is granted with respect to the Individual

Defendants, and Plaintiff's § 1983 claims against the Individual Defendants are dismissed with prejudice.[3]

### B. *Monell* Liability

Having dispensed with Plaintiff's § 1983 claims against the Individual Defendants, the Court must determine whether Plaintiff's claims under § 1983 (Claims 1-5) against Defendant Denver may proceed. It is long-standing Supreme Court precedent that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "Instead, it is when the execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Id.* "Thus, on top of an underlying constitutional or federal statutory violation, a municipal-liability plaintiff must prove three elements: (1) an official policy or custom, (2) that caused an underlying injury, and (3) culpable state of mind." *Harden v. Hedgecock*, 181 F.4th 1094, 1101 (10th Cir. 2026) (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013)). The parties only address the first element in their briefing, and the Court assumes the parties do not dispute "causation" and "culpable state of mind" elements are satisfied in this case.

For a municipality to be held liable for "either a failure-to-train or failure-to-supervise claim, an individual officer (or deputy) must have committed a constitutional violation." *Est. of Burgaz by & through Zommer v. Bd. of Cnty. Commissioners for Jefferson Cnty. Colorado*, 30 F.4th 1181, 1189 (10th Cir. 2022) (citing *Crowson v.*

---

[3] Claims 1-5 are dismissed only with respect to the Individual Defendants.

*Washington Cnty., Utah*, 983 F.3d 1166, 1187 (10th Cir. 2020)). Here, the Court has determined that Individual Defendants are entitled to qualified immunity on the clearly-established prong, without finding whether a constitutional violation occurred. As described below, the record could establish an underlying constitutional violation for the failure-to-supervise *Monell* theory to proceed.

For other *Monell* claims, "such as those alleging an unconstitutional policy or custom, plaintiffs need not demonstrate an individual officer committed a constitutional violation." *Id.* at 1190. "Instead, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Id.* Here, Plaintiff asserts "Denver has multiple unconstitutional customs and practices that caused its officers to violate his rights." ECF No. 110 at 24-25.

"A municipal policy or custom can take the form of: (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from "deliberate indifference" to the injuries that may be caused." *Elias v. City of Loveland*, No. 22-CV-00644-RMR-SKC, 2023 WL 8530802, at *6 (D. Colo. Mar. 23, 2023) (citing *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010)). Here, Plaintiff does not direct the Court to a formal

regulation or decisions of final policymakers related to police retaliation against individuals who are filming or critical of police action. Instead, Plaintiff appears to argue that an "informal custom" of retaliating against such individuals exists.

"Municipal liability may be based on an informal custom so long as this custom amounts to a widespread practice that, although not authorized by written laws or express municipal policy, is so permanent and well settled as to constitute a custom or usage within the force of law." *Elias v. City of Loveland*, No. 22-CV-00644-RMR-SKC, 2023 WL 8530802, at *6 (D. Colo. Mar. 23, 2023) (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010)). "A plaintiff may establish the existence of such a continuing, persistent and widespread custom by offering evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Id.* (citing *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008)).

In *Elias*, the plaintiff alleged "over a dozen examples of arrests" that occurred under similar circumstances and conducted by the same officers in his case. *Id.* These examples had comparable key facts: "the drivers were pulled over and despite showing no signs of impairment were nevertheless arrested and charged with DUIs only to have the charges dismissed because the blood test results showed no impairing substances." *Id.* Therefore, this Court reasoned that the plaintiff's allegations were sufficient to demonstrate "a culture focused on accumulating DUI arrests and traffic citations" and, thus, "a widespread custom, policy, or practice" for his *Monell* claim to survive the motion to dismiss. *Id.* at *7.

Although the instant case is at the summary judgment stage, the analysis in *Elias* is informative. Here, Plaintiff states that he has presented "strong evidence of DPD [Denver Police Department] officers repeatedly retaliating against individuals who are filming and/or critical of police action." ECF No. 110 at 25. Plaintiff identifies sixteen other individuals that "DPD officers retaliated against, arrested, and illegally searched" for criticizing or filming them and submits declarations for each of these individuals. *Id.* at 11-14. For example, Susan Greene, an investigative reporter, stated in her declaration that she was "unlawfully arrested by Denver Police Department ("DPD") officers for filming their activities from a public sidewalk." ECF No. 110-15 ¶¶ 2-3. Another individual, Elijah Wesbrok, declared that he was recording near an office building of the Federal Bureau of Investigation ("FBI") from the public sidewalk. ECF No. 110-18 ¶¶ 4-5. A DPD officer approached Wesbrok, and Wesbrok began recording the officer. *Id.* ¶ 5. Wesbrok remained on the sidewalk, recording, and refused to talk to the officer. *Id.* ¶¶ 6-8. One of the officers told Wesbrok that he could not go onto FBI property, but Wesbrok "had never entered FBI property and had been on the sidewalk the entire time." *Id.* ¶ 9. Another officer appeared on the scene and, together, they "grabbed [Wesbrok's] arms and forced them behind [his] back." *Id.* ¶¶ 7, 11. A third individual, Natalie Kantor, also provided a declaration explaining that she was arrested after filming and criticizing the police after she witnessed her "friend [] yelling out 'just let me breathe' as the two officers put their entire body weight on top of him" during a field sobriety test. ECF No. 110-22 ¶¶ 1, 5-7. The officers searched and arrested Kantor, who was charged with interference. *Id.* ¶¶ 11-

12. Kantor went to trial and the "jury acquitted [her] after less than ten minutes of deliberation." *Id.* ¶ 12.

These are just a few examples provided by Plaintiff describing instances where DPD arrested individuals who were filming their actions. Given the quantity of and similarity between these arrests, a reasonable jury could find that Plaintiff has presented evidence to suggest "a continuing, persistent and widespread custom" that satisfies the "official policy or custom" prong for *Monell* liability. *See Elias*, 2023 WL 8530802, at *6. Plaintiff has presented evidence sufficient to create a genuine dispute of material fact as to "a widespread custom, policy, or practice" to support his *Monell* claims against Defendant Denver. The parties do not address the other two prongs for *Monell* liability—underlying injury and culpable state of mind. To this Court, Plaintiff has sufficiently demonstrated both the underlying injury and culpable state of mind elements through the the BWC footage and the circumstances of his arrest. Therefore, Plaintiff's remaining § 1983 claims against Defendant Denver may proceed.

### C. Section 1983 Claims

Plaintiff alleges several First Amendment and Fourth Amendment violations: Freedom of Speech and Retaliation under the First Amendment; and Unlawful Arrest, Unlawful Search, and Malicious Prosecution under the Fourth Amendment. Defendants argue that the "probable cause supported Manchas' arrest, defeating each of the § 1983 and companion C.R.S. § 13-21-131 claims." ECF No. 105. Thus, the Court will first analyze the First Amendment claims and then the Fourth Amendment claims.

**1. First Amendment – Freedom of Speech**

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987). The Supreme Court has established that "[s]peech is often provocative and challenging. . . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* (citation omitted). The Tenth Circuit has further explained that an important limit to the right to criticize police is "if [the] criticism is accompanied by a physical act which interferes with an officer's official duties." *Jordan v. Jenkins*, 73 F.4th 1162, 1170 (10th Cir. 2023). For example, "if the act of criticizing itself is so loud that an officer is prevented from executing his or her duties, then the officer may restrict the speech based on this physical act, which does not rely on the content of the speech." *Id.*

The question before the Court is whether Plaintiff's speech was protected First Amendment speech or fell outside First Amendment protections as a "physical act" that interfered with the officers' duties. Defendants argue that any restriction on Plaintiff's speech was "a result of the volume of his commentary, proximity to officers, distracting effect, and resulting safety concerns." ECF No. 105 at 13. Plaintiff contends that he was standing "a considerable distance from Defendants throughout the interaction" and did not "physically interfere[] with the Individual Defendants, or any others." ECF No. 110 at 16.

At this stage, the Court must determine whether Defendants are entitled to summary judgment. The record reflects that Plaintiff was arrested for "interference" under Denver Revised Municipal Code § 38-31(a) (May 4, 2022). By the time Plaintiff was placed in handcuffs around 2:03 a.m., the Defendant officers had already initiated the high-risk traffic stop and detained the driver and passenger of the Volkswagen. Even with Plaintiff's loud comments, Defendants Faile and Stewart were able to handcuff, question, and direct the driver of the Volkswagen into the back of a police car. Defendant Simmons was also able to pat-down the passenger of the Volkswagen. To this Court, Individual Defendants were able to execute their duty of executing the high-risk traffic stop and securing the driver and passenger of the Volkswagen.

Defendants argue a separate duty still remained—the securing of the handgun in the Volkswagen. ECF No. 105 at 10. Plaintiff states the "handgun was directly next to a supervisor on scene, Sergeant Robert Krelle" and arguably "secured" for the purposes of the high-risk traffic stop. ECF No. 110 at 6. From the record before the Court, it is unclear whether the handgun was truly "secured" or not. Therefore, a factual dispute remains as to whether the Defendant officers were able to execute all of their duties and, thus, whether Plaintiff's "act of criticizing itself [was] so loud that an officer [was] prevented from executing his or her duties." *See Jordan*, 73 F.4th at 1170. Given the live dispute over this material fact, Defendants' motion for summary judgment is denied with respect to Plaintiff's First Amendment free speech claim against Defendant Denver.

**2. First Amendment – Retaliation**

"As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (quoting *Hartman*, 547 U.S. at 256). In order to prevail on a First Amendment retaliation claim, "a plaintiff must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury." *Id.* (quoting *Hartman*, 547 U.S. at 259). As part of this test, a plaintiff must prove "that the decision to press charges was objectively unreasonable because it was not supported by probable cause." *Id.* at 400-01.

Defendants argue that that the "undisputed material facts demonstrate that there was probable cause to arrest Manchas." ECF No. 105 at 14. According to Defendants, Plaintiff "was in close proximity to a high risk stop, distracting the officers with high-volume questions and comments, potentially preventing both the occupants of the vehicle and the officers from communicating." *Id.* Additionally, the "danger the officers perceived was heightened by the fact that an unsecured gun was in the stopped vehicle." *Id.* Defendants cite Denver Revised Municipal Code § 38-31(a) (May 4, 2022), which states "[i]t shall be unlawful for any person, in any way, to interfere with or hinder any police officer, any member of the police department, or any person duly empowered with police authority,

while such officer, member, or person duly empowered with police authority is discharging or apparently discharging their duties."

Plaintiff contends that Defendants' argument "rests on factual flaws" and that the First Amendment "protects the right to remain in the area to be able to criticize the observable police conduct." ECF No. 110 at 17 (quoting *Jordan*, 73 F.4th at 1169). In *Jordan*, the Tenth Circuit analyzed probable cause for arrest in the context of First Amendment retaliation. The plaintiff in *Jordan* engaged in a verbal altercation with officers investigating a car accident, telling the officers they were "too high strung" and mockingly saying "don't shoot me." *Jordan*, 73 F.4th at 1165-66. One of the officers ordered the plaintiff to "put his hands behind his back" and, when the plaintiff did not immediately comply, the officer "grabbed his arm and used a takedown maneuver to bring Mr. Jordan to the ground." *Id.* at 1166.

The interaction resulted in the plaintiff's arrest for obstruction of justice and resisting arrest under Colo. Rev. Stat. §§ 18-8-103, 104. *Id.* at 1167. Under § 18-8-104, an individual commits obstruction of a peace officer when "by using or threatening to use violence, force, physical interference, or an obstacle, such person knowingly obstructs, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer, acting under color of his or her official authority." *Id.* Ultimately, the Tenth Circuit determined that the plaintiff's "criticism was constitutionally protected by the First Amendment" and there was no probable cause to arrest him, because his criticism was not accompanied by a physical act that interfered with the officer's official duties. *Id.* at 1170. The Circuit Court illustrated three examples of "physical interference": (1) "if an

individual is physically blocking the officer from accessing a crime scene while criticizing the officer"; (2) "if the act of criticizing itself is so loud that an officer is prevented from executing his or her duties"; or (3) "if criticism of an officer has the function of coaching a witness." *Id.*

"[T]he First Amendment does not protect only quiet and respectful behavior towards police; it protects loud criticism that may annoy or distract the officer." *Id.* at 1169. Here, Plaintiff's behavior was undoubtedly annoying, distracting, and disrespectful to the Defendant officers. His incessant comments and questions probably made it difficult for the Defendant officers to complete their duties. However, the officers were able to detain the Volkswagen driver and pat-down the passenger before Plaintiff was arrested. As previously discussed, the question is whether the handgun from the Volkswagen was secured and whether securing the handgun was a duty of the Individual Defendants. Because the parties dispute this material fact, Defendants are not entitled to summary judgment on the First Amendment retaliation claim.

### 3. Fourth Amendment – Unlawful Arrest and Unlawful Search

Defendants briefly address Plaintiff's Fourth Amendment unlawful arrest and unlawful search claims. First, Defendants state that "[a]n unlawful arrest claim requires a plaintiff to show that the arresting officer acted in the absence of probable cause that the plaintiff had committed a crime." ECF No. 105 at 13 (citing *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012)). Next, Defendants argue that the "Fourth Amendment permits a warrantless search incident to a lawful arrest, so the existence of probable cause also defeats Manchas' unlawful search claim." ECF No. 105 at 14. Ultimately, they

conclude that the "undisputed material facts demonstrate that there was probable cause to arrest Manchas." *Id.*

Presumably, Defendants suggest that a finding of probable cause supports summary judgment in their favor with respect to Plaintiff's Fourth Amendment unlawful arrest and unlawful search claims. However, the Court has determined that material facts remain in dispute with respect to probable cause. Thus, the Court is unpersuaded by Defendants' arguments, and their motion for summary judgment on Plaintiff's Fourth Amendment unlawful arrest and unlawful search claims is also denied.

#### 4. Fourth Amendment – Malicious Prosecution

"The elements of a malicious prosecution claim are: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1063 (D. Colo. 2021). With respect to the second element, the Supreme Court has explained that "[t]o demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 39 (2022). Defendants argue that Plaintiff's "deferred prosecution" under Colo. Rev. Stat. § 18-1.3-101 does not constitute "a favorable termination and precludes a malicious prosecution claim." ECF No. 105 at 17. Plaintiff responds that "it is undisputed that

Manchas' prosecution was dismissed, without a conviction, after he completed the terms of his deferred prosecution agreement." ECF No. 110 at 21.

The parties dispute whether Plaintiff's deferred prosecution constitutes "favorable termination" under *Thompson*. In *Thompson*, the Supreme Court meticulously analyzed legal precedent and historical practices to determine that "the original action terminated in favor of the plaintiff" meant that "the criminal prosecution ended without a conviction." *Thompson*, 596 U.S. at 49. Here, Defendants rely on the fact that "deferred prosecution" was not explicitly mentioned in *Thompson*. However, *Thompson* clearly states that "a plaintiff could maintain a malicious prosecution claim when, for example, the prosecutor abandoned the criminal case or the court dismissed the case without providing a reason." *Id.* at 45.

In this case, Plaintiff's prosecution was dismissed after he completed the terms of his deferred prosecution agreement. Under the reasoning in *Thompson*, his claim terminated in his favor and satisfies the second element of a malicious prosecution claim. Because Defendants only address this second element in their motion for summary judgment, the Court denies the motion with respect to Plaintiff's malicious prosecution claim.

**D. Privacy Protection Act**

The Privacy Protection Act ("PPA") prohibits "police searches for certain types of documents intended for publication." *Guest v. Leis*, 255 F.3d 325, 340 (6th Cir. 2001). The statute was passed in response to *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), "in which the Supreme Court held that the Fourth Amendment did not prohibit police from

undertaking searches and seizures of documentary evidence held by innocent third parties, such as the newspaper whose records were searched in the case." *Id.*

Under the Privacy Protection Act ("PPA"), "it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate or foreign commerce; but this provision shall not impair or affect the ability of any government officer or employee, pursuant to otherwise applicable law, to search for or seize such materials, if ... there is probable cause." 42 U.S.C. § 2000aa. The Act contains an exception that bars a PPA claim "if there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate." *Id.* § 2000aa(a)(1).

The Tenth Circuit has clarified that the PPA creates a civil cause of action "against the United States, against a State (if the State has waived sovereign immunity), or against 'any other governmental unit.'" *Davis v. Gracey*, 111 F.3d 1472, 1481 (10th Cir. 1997) (citing 42 U.S.C. § 2000aa-6(a)(1)). Defendants argue this claim is inappropriately raised, because Colorado has not waived sovereign immunity. However, Defendant Denver is not a state but a governmental unit. Thus, Plaintiff appropriately asserts his PPA claim against Defendant Denver.

Defendants also argue for summary judgment on Plaintiff's PPA claim, because § 2000aa-6(b) provides a complete good faith defense if "the officer or employee had a

reasonable good faith belief in the lawfulness of his conduct" and Plaintiff "did not indicate an intent to act as a journalist by disseminating the video." ECF No. 105 at 20. Defendants explain that, in addition to the officers' alleged probable cause to arrest, "[t]here are no allegations and nothing in the record to suggest that a DPD official ever sought to unlock Manchas' phone, that his phone was the intended object of a search, or that any DPD official or employee did anything other than hold possessions that he was not allowed to have while in jail." *Id.* at 20-21.

The PPA only applies to "work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication." Today, nearly every American has a personal device with the capability of recording and videoing within arm's reach. But, when the PPA was passed, such gadgets did not exist. As the Sixth Circuit aptly explained in a computer search case, the "statute's protection of documents held by publishers such as mainstream newspapers may be straightforward, but the interpretation of the act presents particular challenges in a situation unforeseen by the drafters, that of a computer search." *Guest v. Leis*, 255 F.3d 325, 341 (6th Cir. 2001).

Here, Plaintiff could be seen as a free-lance, individual reporter criticizing police conduct and recording a video of such conduct to disseminate online. However, the evidence before the Court demonstrates that the officers took Plaintiff's phone because he was under arrest for interference. The evidence does not demonstrate that Defendant Faile took Plaintiff's phone because it was "work product material" she reasonably believed Plaintiff intended to disseminate to the public. To this Court, the record shows

that Defendant Faile took Plaintiff's phone because he was under arrest and not allowed to have it while in jail. Therefore, the Court grants summary judgment in favor of Defendants with respect to the PPA claim.

### E. Colorado Claims Pursuant to § 13-21-131

Defendants address Plaintiff's Colorado state law claims in a single sentence in their conclusion: "Manchas is unable to establish a violation of his constitutional rights so as to maintain a claim under § 1983 or C.R.S. § 13-21-131." ECF No. 105 at 21. The statute explicitly states "[s]tatutory immunities and statutory limitations on liability, damages, or attorney fees" and the Colorado Governmental Immunity Act do not apply to claims brought pursuant to this section. Colo. Rev. Stat. § 13-21-131(2). Thus, Individual Defendants are not immune to these claims.

Defendants make no substantive arguments in support of their assertion that summary judgment should be entered in their favor on Plaintiff's state law claims. The Court "is not obligated to 'comb the record' and make [Defendants'] case for [them] by locating facts [they] did not specifically reference in [their] motion materials." *Koverman v. Cantwell*, 124 F. App'x 619, 621 (10th Cir. 2005). Additionally, at this stage, the Court must view the evidence and draw reasonable inferences in the light most favorable to the Plaintiff. Having decided there is dispute over a material fact impacting any underlying constitutional violation, the Court denies Defendants' motion with respect to Plaintiff's claims brought under Colo. Rev. Stat. § 13-21-131.

## IV. CONCLUSION

For the reasons stated herein, it is **ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 105) is:

1) **GRANTED IN PART** with respect to Plaintiff's § 1983 claims against Individual Defendants;
   a. Plaintiff's Claims 1-3 and 5 are **DISMISSED WITH PREJUDICE** with respect to Defendants Faile, Stewart and Simmons. Plaintiff's Claim 4 is **DISMISSED WITH PREJUDICE** with respect to Defendants Stewart and Faile;
2) **GRANTED IN PART** with respect to the Privacy Protection Act;
   a. Plaintiff's Claim 6 is **DISMISSED WITH PREJUDICE**; and
3) **DENIED IN PART** with respect to Plaintiff's § 1983 claims against Defendant Denver;
   a. Plaintiff's Claims 1-5 against Defendant Denver shall proceed to trial; and
4) **DENIED IN PART** with respect to Plaintiff's Colo. Rev. Stat. § 13-21-131 claims;
   a. Plaintiff's Claims 7-11 shall proceed to trial.

DATED: September 16, 2026

BY THE COURT:

____________________________________
REGINA M. RODRIGUEZ
United States District Judge